### VAN AUKER v. TOAN.

1. FRAUD—EVIDENCE—PRESUMPTION.
   Fraud is not to be presumed or lightly inferred.

2. SAME—CANCELLATION OF INSTRUMENTS—DEEDS.
   In a suit for the cancellation of certain deeds, claimed to have been obtained by fraud by defendants, in an exchange of properties, the burden of proof resting upon plaintiffs is not sustained where the proof of defendants' participation in the fraud rested upon inference or suspicion; the evidence showing that plaintiffs relied upon the real estate broker who represented them and with whom all their dealings were had.

3. APPEAL AND ERROR—DELIVERY OF DEEDS—REVIEW.
   Where, from the evidence, the court below might well have found for defendants that the delivery of the deeds was completed, a decree dismissing the bill without passing. upon the question of delivery will be affirmed, upon appeal.

Appeal from Jackson; Parkinson, J. Submitted October 16, 1918. (Docket No. 73.) Decided December 27, 1918.

Bill by Ira Van Auker and others against Robert O. Toan and others for the cancellation of certain deeds on the ground of fraud. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

*James J. Noon* and *Thomas M. Poynton*, for plaintiffs.

*John F. Henigan*, for defendants.

STONE, J. The bill of complaint herein was filed for the purpose of obtaining cancellation and surrender of certain deeds executed by the plaintiffs to the defendants Robert O. Toan and wife, and an abrogation of plaintiffs' contract or bargain of purchase of a certain farm taken in exchange therefor. In May, 1915, the plaintiffs were the owners of five houses and lots, all subject to mortgages, in the city of Jackson, which they had listed with Harry J. Holt, a real estate agent, to sell for them, and he had examined the properties. The defendants Robert O. Toan and his wife, Edna M. Toan, owned an equity in a farm of 105 acres in Columbia township, Jackson county, known as the Johnson farm, which they held under an assignment of a land contract bearing date August 7, 1912, made by James Johnson and wife of the first part, and John H. Griffith and wife of the second part, the consideration of which was $4,000. This contract had been assigned by said Griffith and wife to said Toan and wife on October 5, 1914, in a trade for certain other Jackson real estate. Eight hundred dollars had been paid upon this contract, and it provided that on October 1, 1915, there would be due thereon $160 of interest, and $200 of principal. This property, by the Toans, had been also listed with Holt for sale. Both the plaintiffs and said defendants Toan were, in a measure, represented by the said Holt.

The case presents mainly disputed questions of fact, and there is a great conflict in the testimony of the

parties, and the record is a large one. The learned circuit judge, after hearing all of the testimony, upon the final hearing, denied relief to the plaintiffs and dismissed the bill of complaint. The plaintiffs have appealed, and they state that the grounds upon which their appeal is based are:

(1) That there was no valid delivery of the deeds.
(2) That the consideration has wholly failed.
(3) That defendants secured possession of the deeds fraudulently.

The manner in which the exchange of properties was brought about is pretty well illustrated in the testimony of the plaintiff Ira Van Auker. On direct examination, after describing the Jackson city lots and property, he testified:

"I first met Holt in April, 1915. He came to our place with a gentleman to look at the house we had for sale. I didn't know anything about the Johnson farm then. Mr. Holt came up to our place about a week later to look those houses over, and we listed them with him to sell.

"Q. When did you first learn of the Johnson farm?

"A. It wasn't but a very short time after that he came to our place and he said he had a man on the string, he thought he could change those houses into a farm for us if we saw fit and get them condensed. I said to him we didn't care for a farm. He said, 'I can change that farm for you right away into a block where you will have your property condensed and get out of debt.' We considered—we had him look this deal up. He didn't mention the Johnson farm at that time. A few days after he made the proposition about the Johnson farm. I wasn't at home. I was in Battle Creek then. It must have been about the first of May that we discussed the matter. He had told my wife about this and she asked my opinion about trading for this place, and I said if the farm was worth the money, and he could change it off in such a way as we could get out of debt, that was what we wanted to do.

"Q. Was there any other talk until the 10th day of May?

"*A.* Not with me, no, sir.

"*Q.* On the 10th of May these deeds were made out, were they?

"*A.* Yes, sir. Just let me make one more statement. When I came home Saturday in the evening, he had made the proposition with my wife that he'd take us out to this farm on Sunday morning, all three of us (myself, my wife and son) to look the farm over, and I said I wouldn't go on Sunday to look a piece of property over, and in the first place I wasn't a judge of farm property, and he claimed to be a judge, and I said 'let—if he is the judge that he says he is, he has been in it a lifetime—let him look the property over and if he is satisfied we can get the worth of our property out of it, we will make the change.' The day the deeds were signed, we met at Holt's office. I did not see Mr. Toan on that day.

"*Q.* Up until the time this deal was made had you talked with Mr. Holt about a land contract; anything said about a land contract?

"*A.* No, sir. There was an agreement by which the farm was to be retained by Toan until the first of November, and we were to retain the home we lived in. There was nothing further until fall, more than this. We called Holt two or three different times to get a deed of the farm and get it recorded, and he put us off, saying he had the deal for the block nearly completed, and to leave it in his safe until this was completed, and then we could make the change all at once.

"*The Court:* Did you suppose you were getting a deed?

"*A.* Yes, sir, never supposed that we were getting anything else but a deed."

One cannot read this record without being satisfied that at this time both the plaintiffs and the defendants Toan and wife placed implicit confidence in the man Holt, who turned out to be dishonest, and later left the country. The only writing relating to the deal, save the deeds of the houses and lots, and the assignment of the land contract from Toan and wife to the plaintiffs, consisted of the written agreement

by which the defendants Toan were to retain the possession of the farm until November 1, 1915, and the plaintiffs were to continue to occupy one of the houses involved in the sale in which they then lived, until November 1, 1915. The deeds that were executed upon the 10th day of May, 1915, were left with Holt, who also had the assigned land contract in his possession. Just what the understanding was, as to the delivery of the deeds was one of the disputed questions in the case, it being the claim of the plaintiffs that the deeds, as they testified, were left in escrow with Holt to be held by him until the whole matter was consummated.

It is the claim of the defendants Toan that the deeds were delivered absolutely to them, and that they were simply left in the possession of Holt as a sort of collateral security for the payment of a certain note for commissions, that had been given by defendant Robert O. Toan to Holt, and which note Holt had indorsed and discounted at a bank in Jackson.

It is significant and somewhat unusual, that the plaintiffs in this trade had personally no interviews with the defendants Toan, but that Holt was the go-between in all of the negotiation. Possession had been given to the defendants of the city property, with the exception of one house occupied by the plaintiffs. There had been turned over to the defendant Robert O. Toan certain building and loan association books relating to the mortgages upon the Jackson city lots, and certain money had been paid by defendant Toan to the building and loan association; a furnace and electric lights had been put in one of the houses which had been deeded to Toan and wife, and said defendants took charge of the property conveyed, renting portions thereof, with the one exception mentioned.

Things ran on until October 1, 1915, when Johnson, the owner of the farm in question, called the at-

tention of the plaintiffs to the fact that an install-ment of principal of $200 and $160 of interest were due on the contract upon October 1, 1915, and that unless those amounts were promptly paid he should take steps to forfeit the contract. Although the plaintiffs claim in their testimony that they supposed they were receiving a deed of the Johnson farm subject to a mortgage of $3,200, yet they made an effort to raise the money to pay the installment due upon the contract, but were not successful. Johnson proceeded to declare the contract forfeited, but later offered to receive the amount due upon the contract, which would reduce the amount unpaid to $3,000, offering to deed to the plaintiffs, they giving him a mortgage back for $3,000, in accordance with the terms of the contract. This offer plaintiffs did not comply with, but refused to pay anything. After the plaintiffs were informed of the conditions surrounding the farm and the nature of their title thereto, or interest therein, which was about October 1st, they took no steps to rescind the trade.

The defendants Toan and wife, about the middle of November, moved from the farm into one of the houses deeded to them by the plaintiffs, and adjoining the one occupied by the plaintiffs, and proceeded to collect the rents upon the other houses, except the one occupied by the plaintiffs. The defendants also disposed of one of the houses and lots deeded to them, realizing a small sum therefor, and generally took charge of the property. Soon after this, and probably in the month of November, 1915, the plaintiffs consulted Mr. Kirkby, an attorney who had been doing some business for Johnson, relating to the forfeiture of the land contract. Mr. Kirkby was sworn as a witness in the case, and it appears from his testimony that the burden of the complaint of the plaintiffs to him was that Holt had misrepresented to them

the value of the Johnson farm; that he had represented to them that the property was worth at least $5,000 over and above the incumbrance upon it; that he had promised to exchange that farm for certain property in the city of Jackson, known as the Pope block, on Francis street, and that they had placed implicit confidence in him.

This record shows that the plaintiffs have to blame their own credulity in believing all that Holt said to them. Mr. Kirkby saw Holt, who promised to adjust the matters, and Kirkby testified that he at that time learned that the deeds of the houses and lots in Jackson were still in the hands of Holt, and that Holt promised the same should not be delivered until the whole matter was adjusted. Mr. Kirkby advised against the payment of anything upon the land contract. Mrs. Van Auker, one of the plaintiffs, consulted with Mr. Kirkby, and upon that subject he testified as herein stated in the opinion of the court.

Holt left the country in December, 1915, and as the record shows he never returned. He left his office in charge of a Mr. Harrison. Mr. Toan went to the office to obtain his deeds after learning that they had not been recorded, as he claims Holt promised should be done and the fees paid, as Holt had money in his hands belonging to Toan, arising from rents collected, and other moneys that he had collected and finally got away with. Harrison testified that Holt had said to him that the deeds were kept by him as collateral security for the note which had been given him by Toan for commissions, and which had been discounted by Holt at the bank; and that he would deliver the deeds to Toan as soon as that note was paid, or in some way canceled so far as his liability was concerned. Toan called upon Harrison for the deeds. He had canceled the Holt note by a renewal thereof, so that Holt was no longer liable thereon, and claimed

that he was entitled to the deeds.  Harrison made search and could not find the deeds, but there was one compartment in the safe of which Harrison had no key.  He later obtained the key to that drawer, opened it, and found the deeds, which he delivered to Mr. Toan, and the same were placed on record on February 21, 1916.  Toan also served notice upon the plaintiffs to quit the possession of the house and lot occupied by them, and embraced in one of the deeds, they refusing to pay rent.

These are some of the salient points upon which testimony was given, and these conditions continued, until proceedings were brought by defendants Toan to obtain possession of the house and lot occupied by the plaintiffs, when the bill of complaint herein was filed on April 5, 1916, and an injunction was issued and served.

The learned circuit judge, in a carefully considered opinion, reviewed the testimony in the case at some length.  The first question considered by him in his opinion was as to whether defendant Toan was shown to be a party to the fraud.

*Second.* Whether the transfer of properties was complete so that Holt may be said to have been holding the deeds of the Van Aukers for the defendants Toan.  In other words, As to the Van Aukers, had there been a delivery?

*Third.* Whether delivery was or was not complete, Are plaintiffs now entitled to a rescission of the contract?

The learned circuit judge found upon the first point that there was no direct evidence of any fraudulent act or misrepresentation on the part of defendant Toan.  In fact, it may be said, from this record, that the plaintiffs hardly knew the defendants Toan.  They did business with the man Holt; and they allowed Holt to represent them in the trade.  The circuit judge

found that if the conduct of Toan was to be questioned in respect to his good faith, it could only rest upon inference or suspicion, and that the proofs in his judgment did not establish it; that fraud is not to be presumed, or to be lightly inferred. In this view we are constrained to agree with the trial judge. We are of the opinion that the plaintiffs have not sustained the burden of proof placed upon them relating to this question.

2. Upon the second and third points the circuit judge reached a conclusion which he stated as follows:

"2. As to the kind of conveyance or transfer to be made by Toan to the Van Aukers and whether the transfer was intended to be complete, there is evidence on either side. The Van Aukers claim they were to have a warranty deed; that they were told the outstanding indebtedness on the farm was secured by a mortgage on which no principal was due for three years and that they had no knowledge Toan's interest was only that of a vendee in a land contract or that a payment of $200 of principal besides $160 of interest fell due October 1st. They never went to inspect the farm; they never sought to ascertain, except from Holt, the nature of Toan's interest in the farm; nor to have any abstract of title furnished or to be shown Toan's deed, but trusted all to Holt.

"And before October 1st and soon after the execution of the deeds and the assignment of Toan's contract of purchase, the parties began to perform and carry out their bargain. Toan took possession of a part of the property, disposed of another part. Whatever the parties did before October 1st I do not regard as so material and significant as what they did after that date. And it seems to be conceded that Holt was holding out to the Van Aukers that he could trade their equity in the Toan farm for a certain building in Jackson and if not, he could for other property and so improve their financial condition. After they learned of the situation of the farm, as to title and value, from its owner, Mr. Johnson, and on or about October 1st, they consulted Mr. Kirkby, who was then also the attorney for Mr. Johnson, who was seeking

payment of the interest and $200 installment of the principal. They then learned the condition as to title and Toan's interest in the farm when Johnson pressed for pay October 1st, or very soon thereafter.

"After that they sought to have Holt make things right and directed him to keep in his possession the deeds made by the Van Aukers and all papers then held by him until he should make things right. He promised to do this. After some delay he absconded. Then Toan went to Holt's office and induced the person in charge to permit him to obtain the deeds. He claims they were his and that he was entitled to them. They claim they were not his, that Holt was simply the custodian holding them in escrow; that they had the right to recall them and that Toan can derive no advantage from so obtaining the possession of these conveyances. I am inclined to think I need not finally pronounce an opinion upon this question, as I think the next proposition I discuss may dispose of it.

"After October 1st the Van Aukers seem to be laying all responsibility on Holt and to be pressing him to make things right. Toan was still in the possession of the Johnson farm; Johnson was pressing for payment. They visited Kirkby, Johnson's attorney. They even make some proposition to turn over a contract to satisfy Johnson, which Kirkby informs them Johnson will not accept. They seem even at that time disposed to make some arrangement and to keep the farm. Kirkby testifies that from what he learned of the entire transaction, Holt was trying to defraud plaintiffs out of their property. He says Holt was evidently delaying the thing and it looked like he was going to beat them out of all the property they had. And during the arguments of counsel, Kirkby was again placed on the stand and the following occurred:

" 'The Court: Did she make complaint that if the deed had been given to Toan it was wrong, in violation of any understanding?

" 'A. I don't think she did at first until she found out the condition of affairs, then, of course, she became satisfied everything was wrong.

" 'Q. I know, but I want to get the conversation; if she made any claim that the deed wasn't to be delivered until some other

things were all done, and if it had been delivered it was contrary to the understanding by which Holt held it. Did she make any such claim as that?

"'A. I don't believe so.'

"And it must be remembered that no notice was given to Toan of any rescission, nor that he should not receive the deeds, or obtain them, or that he should not take further possession of the Van Auker property, or that they would not accept, assume or perform the land contract and that to save it from forfeiture he must himself perform its conditions. Nor was any demand made upon him to give up or retransfer any of the property of the Van Aukers over which he had taken control or exercised dominion.

"In addition, in November they permitted him to move into one of the houses on one of the lots they had executed deed of to Toan, and without protest or objection although that lot was next to their own home, or the house they occupied. They did not, of their own accord nor under the advice of Mr. Kirkby, make any claim or demand on Toan or give him any notice whatsoever.

"All this seems to have a material bearing upon the question as to the character of the delivery. However, as I before remarked, the next proposition I discuss, in view of my conclusions respecting it, I will not lay down any final opinion upon this question as to the character of the delivery to Holt or his possession or custody. Nor have I assumed to refer to or review all of the testimony on both sides bearing upon this question of delivery.

"3. If all the contentions of the Van Aukers as to fraud on Toan's part and as to delivery were to be resolved in their favor, still would they now be entitled to a decree for a rescission or cancellation and restoration of their title?

"I understand the rule of law to be that one who is defrauded by another in respect to a contract may either rescind or stand upon his bargain, ratify and confirm it.

"I also understand it to be the duty of one who desires to rescind or repudiate a bargain because of fraud, to act promptly on discovery of the fraud and not to proceed further or continue to act under the

contract or recognize it as binding. As before stated, the Van Aukers learned the truth on or about the first day of October respecting Toan's title to the farm; the condition of his contract as to payments; the amounts paid and owing; the purchase price and everything they now know pertaining to Toan's interest and the terms on which he held and the value of the farm. They make all of their complaints to Holt and to Johnson and his counsel, Kirkby, who also advises them. They do this early in October. Toan still lives on the farm. They give him no notice of a rescission nor make any demand for him to yield up any property he has received from them. They do not forbid his moving onto one of the lots traded to him. He does not do so until after the middle of November. They do not talk to him at all about the situation. Their attorney does not. They urge this was not necessary, as Holt was his agent as well as theirs. But I hardly think Holt was such an agent of Toan's that under the circumstances no other notice to him was necessary. They at least could have mailed him notice or sent it by Johnson, or have been prompt in letting him know that he must give up what he had enjoyed under the deal with them; that he could have nothing further; that they would not take possession of his farm or assume and perform the contract of purchase and that he must take care of his contract rights or lose them. I cannot help suspecting this would have been done had Mr. Kirkby known there was any claim that Toan was guilty of fraud or of participation in it.

"On the contrary, Toan is suffered to ignore the Johnson contract, to let it be forfeited; to move off the farm and to move into one of the Van Auker houses with full knowledge on the part of the Van Aukers that they had been deceived and defrauded. They knew as much early in October as they know now, or at least might have known, but they suffer Toan to change his situation and his relation to the farm and lose by forfeiture such rights as he had and to his pecuniary loss and even to go on unopposed to take possession of additional property under his contract arrangements with the Van Aukers. And they do not in this proceeding offer to restore to him what

he turned over to them, nor can they now do so, but remained silent and inactive as to him, and themselves permitted the forfeiture to become complete and Toan's loss of his contract interest to become final and irreparable.

"If they believed Toan himself was a party to the fraud and if he was such party, still it was their duty to act promptly, after they knew of the fraud and not to hold the contract and permit the forfeiture without giving Toan the opportunity to himself provide against it. He who asks equity should do equity. What he has obtained under a fraudulent contract he should restore if he asks a return of what he has parted with.

"As to the defendants Mr. and Mrs. Toan, I think it must be held that the Van Aukers cannot now rescind. If there was fraud to which Toan was a party, the repudiation of it has not been timely. If so, as to Toan and wife, the contract must be held to be in force.

"It results from these findings that the bill must be dismissed."

After carefully reading and considering the testimony in this case, we have reached the conclusion that the circuit judge might well have found in favor of defendants upon the second question; that he made a proper disposition of the case, and that from all the evidence in the record, we do not feel justified in changing the result reached by him. The decree below is in all things affirmed, with costs to the defendants to be taxed.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.